AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America <br> v. <br> Joshua Bellamy, <br><br> *Defendant(s)* | ) ) ) Case No. 20-mj-6428-AOV ) ) ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **May 21-August 3, 2020** in the county of **Broward** in the **Southern** District of **Florida**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343 and 2 | Wire Fraud |
| 18 U.S.C. §§ 1344 and 2 | Bank Fraud |
| 18 U.S.C. § 1349 | Conspiracy/Attempt to Commit Wire and Bank Fraud |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☒ Continued on the attached sheet.

*Complainant's signature*

Michael Benivegna, Special Agent, IRS-CI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: Sept. 9, 2020

*Judge's signature*

City and state: Ft. Lauderdale, Florida

Hon. Alicia O. Valle, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Michael Benivegna, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of a criminal complaint charging JOSHUA BELLAMY ("BELLAMY" or "Defendant"), with wire fraud, bank fraud, attempt and conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, 1349, and 2, from on or about May 21, 2020, to at least on or about August 3, 2020, in the Southern District of Florida, and elsewhere (the "Target Offenses").

2. Defendant has participated in a scheme to obtain by fraud millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other government programs, conspiring with a person now cooperating with the investigation ("CHS 2") and others. Defendant obtained a fraudulent PPP loan for his own company, Drip Entertainment LLC ("Drip Entertainment"), with CHS 2 providing falsified documents and assisting in submitting the application on Defendant's behalf in exchange for a kickback from the loan proceeds. Defendant also conspired to submit a number of additional fraudulent PPP loan applications for other companies by recruiting other confederate loan applicants. To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms. For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies with minor changes.

3. The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted. Based on the evidence investigators have reviewed to date, CHS 2, Defendant, and their co-conspirators applied for PPP loans that are together worth

more than $24 million dollars, with at least approximately 42 of those loans approved and funded for a total of approximately $17.4 million. Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.

4. I am a Special Agent with the United States Department of The Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since October 2016. I am presently assigned to the Miami Field Office. My duties as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26 of the United States Code), the Bank Secrecy Act (Title 31 of the United States Code), and the Money Laundering Statutes (Title 18 of the United States Code). I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in April 2017 and the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in July 2017. In these two programs, I studied a variety of law enforcement tactics and criminal investigator techniques relating to tax and financial crimes. Since becoming an IRS-CI Special Agent, I have personally investigated and assisted in investigations relating to the Internal Revenue Laws and financial crimes. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Federal Bureau of Investigation and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 program.

5. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and from witnesses.

This Affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.[1]

## PROBABLE CAUSE

### *The Paycheck Protection Program*

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP. In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

---

[1] The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District and elsewhere. As a result, not all numbered sources and anonymous individuals and entities are described in every filing. I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

8. A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

9. PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### *The Scheme to Obtain Fraudulent PPP Loans*

10. On or about May 13, 2020, Phillip J. Augustin ("Augustin") and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of a company owned by Augustin.[2] Augustin submitted a PPP loan of $84,515 to a federally insured bank (hereinafter "Bank 3"), through a third-party company processor (hereinafter "Bank Processor 1").[3] The application included bank statements that are clear forgeries, and CHS 2 has admitted that the application was based on documents that he falsified for Augustin.[4]

---

[2] On or about July 28, 2020, Augustin was charged by complaint in the United States District Court for the Northern District of Ohio on allegations of wire fraud, bank fraud, conspiracy to commit wire and bank fraud, and obstruction of justice. *See United States v. Augustin*, Case No. 1:20-mj-227 (N.D. Ohio July 28, 2020). The charges remain pending against Augustin.

[3] All banks referenced in this Affidavit are insured by the Federal Deposit Insurance Corporation.

[4] On June 25, 2020, investigators arrested CHS 2 and another person now cooperating with the investigation ("CHS 3") and executed search warrants at their residences. Following his arrest, CHS 2 chose to cooperate with the investigation in the hope of obtaining favorable consideration

11. Following the success of that initial fraudulent PPP application, Augustin and CHS 2 began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million. Based on the evidence investigators have reviewed so far, CHS 2 and Augustin collectively coordinated applications for PPP loans that are together worth more than $24 million dollars. The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest. The evidence suggests that all or nearly all of those loan applications were fraudulent, including Defendant's loan application and the applications Defendant orchestrated by referring additional confederates to the conspiracy.

12. Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme, based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others. These applications all follow the same pattern of fraud—many with obviously counterfeit February 2020 bank statements, and all with fabricated IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") with the same indicia of fraud found in Augustin's initial application—but generally with even larger inflated payroll numbers, thus yielding much larger loans.[5] CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to

---

in connection with his pending charges. CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel. Most of his statements related herein have been corroborated by records obtained from third parties or recovered from his electronic devices.

[5] Some loan applications also included voided checks that appear to be falsified, such as a purported Bank 5 check that appears to have been produced on a computer and, as the subject line reads, "Converted to PDF," rather than a scan of an authentic check.

start with a target loan amount, and then "back into" the payroll figures on the form. He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount. In turn, the number of employees reported was chosen based on fictional payroll figures, chosen to avoid an average employee salary that might raise suspicion.

13. CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance. Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements. In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7. In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.

14. A review of records for bank accounts controlled by CHS 2 at Bank 5 confirm CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of that kickback in the early stages of the scheme. CHS 2 explained that they were doing so many loans by the end of May that he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

15. Investigators are still receiving and analyzing records, but based on a preliminary analysis, as of August 31, 2020, investigators had identified a total of $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and another co-conspirator's residences, as described below—or from individuals associated with those entities.

16.  The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme. In executing search warrants at the respective residences of CHS 2 and CHS 3, federal agents found stacks of paper printed out and organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity. The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan. A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees," "Monthly Payroll Expense," and "SBA Loan Pre-Approval Amount." Between CHS 2's and CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

17.  Data obtained from the SBA showed additional PPP loan applications from additional entities that text message and email records show had been referred to CHS 2 by members of the conspiracy.

### *The Fraudulent PPP Loan to Defendant's Company: Drip Entertainment*

18.  According to Florida's Division of Corporations website ("Sunbiz"), Drip Entertainment was incorporated in or around September 2018. BELLAMY is listed as the company's sole manager. According to Sunbiz, the principal address of Drip Entertainment appears to be the same address as that of the law firm that is the company's listed registered agent.

19.  According to Sunbiz, Drip Entertainment was administratively dissolved in or around September 2019 for failure to file an annual report. It remains inactive to this day.

20.  On or about May 27, 2020, a PPP loan application package on behalf of Drip Entertainment was electronically submitted to Bank 2 through Bank Processor 1. The loan application package included, among other documents: (1) purported Forms 941 for all four

quarters of 2019 in the name of Drip Entertainment; (2) a company bank statement for Drip Entertainment; (3) an application form; and (4) a resolution to borrow.

21.     The purported Forms 941 included in the application show quarterly payroll of almost $1.5 million each quarter, for 47 employees. That quarterly payroll figure yielded the PPP loan application's "Average Monthly Payroll" figure of $498,626, which determined the $1,246,565 amount of the loan. Each Form 941 was signed by hand with the name "Joshua Bellamy" as the company owner, and also listed BELLAMY as the company's designee and as a "Paid Preparer," though he is not a paid tax preparer. The Drip Entertainment Forms 941 follow the same style and pattern as the many other Forms 941 that CHS 2, described above, acknowledged that he helped create and submit in the course of the scheme, including in the indicia of fraud.[6] IRS records show that Drip Entertainment did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that Drip Entertainment did not report any wages or employees for that same period.

22.     The purported company bank statement, which was submitted in electronic format, is a clear forgery. First, according to the document's file "properties," the statement was created

---

[6]     As noted above, BELLAMY was listed as both owner and paid preparer. Dozens of other Forms 941 submitted in this scheme evidence the same error. CHS 2 has admitted that these documents share that feature because he misunderstood the form, and he (or someone following his instructions) prepared all of the Forms 941 at issue. The content of the forms also indicate falsification. All four quarterly forms are nearly identical, and the four forms for Drip Entertainment are identical, down to the penny, in reported figures. They also evidence a pattern of payroll spending that is likely false: each of the quarters shows significant increases from the first to second to third month of the quarter. For each identical form, the same figures are reported for the tax liability incurred in the first month of each quarter, the same figure for the second month of each quarter (increased substantially from the first month), and the same figure for the third month of the quarter (increased substantially from the second month). The result is that the company reports a perfectly repeating cycle of ascending payroll costs within each quarter. CHS 2 has explained that this was due to a formula he used, allocating different percentages of the quarterly payroll tax liability to each month of each quarter.

using "PDFFILLER," a program used to edit electronic PDF files, and was "modified using iText." Second, the statement is a recycled version of the same falsified Bank 7 statement used in other fraudulent applications submitted as part of this scheme.

23. The application form, labeled at the top, "Paycheck Protection Program Borrower Application Form," listed BELLAMY as the owner of Drip Entertainment, claimed the company had 47 employees, and stated that the average monthly payroll was $498,626. Based on this figure, the amount of the PPP loan request was $1,246,565. The application form required the borrower to electronically initial a number of "certifications," including: (1) that the applicant was in operation on February 15, 2020 and had employees to whom it paid salaries/payroll taxes or paid independent contractors, as reported on Form(s) 1099; (2) that the funds would be used to retain workers, maintain payroll, or make mortgage/interest/lease/utility payments as specified by the PPP rule and that unauthorized use could result in charges for fraud; and (3) that the information provided in the application, including in supporting documents, was "true and accurate in all material respects," and that making false statements could result in criminal charges. The application was electronically signed with the name "Joshua Bellamy," and each certification was electronically initialed "JB."

24. The resolution to borrow set forth the amount of the loan ($1,246,565), and a number of certifications by the borrower, Drip Entertainment, including that it was "in good standing under and by virtue of the laws of the State of its organization." The document was electronically signed with the name "Joshua Bellamy."

25. Based on the representations made in the loan application paperwork and supporting documents, the PPP loan application for Drip Entertainment was approved, and on or

about May 28, 2020, Bank 2 wired approximately $1,246,565 in loan proceeds into BELLAMY's personal bank account.

### *CHS 2 Confirmed to Law Enforcement that the Drip Entertainment PPP Loan Was Fraudulent and that BELLAMY Referred Others to the Scheme*

26. Investigators spoke with CHS 2 about BELLAMY and the Drip Entertainment PPP loan. CHS 2 stated that he had met BELLAMY through Augustin, who had asked him to prepare the loan application for BELLAMY. CHS 2 also stated that he discussed with BELLAMY the 25% fee that CHS 2 was charging for the loan. CHS 2 confirmed that the Drip Entertainment loan application was indeed fraudulent and that he had assisted BELLAMY in preparing and submitting it. Specifically, CHS 2 stated that he: (1) created for BELLAMY an online account for Drip Entertainment with Bank Processor 1; (2) created and submitted the fake Drip Entertainment bank statement; and (3) created, submitted, and signed (on behalf of BELLAMY), the false Forms 941. CHS 2 stated that he did not know who electronically signed the actual loan application paperwork. However, according to IP records from Docusign, the eSignature platform used by Bank Processor 1, a computer with an IP address (ending in 164) associated with the residence of one of Augustin's associates in Broward County, Florida, was used to electronically sign the Drip Entertainment loan application.

27. CHS 2 also stated that, in addition to the Drip Entertainment loan, BELLAMY referred to him a number of friends/associates for the purpose of creating and submitting additional fraudulent PPP loans. CHS 2 explained that he submitted fraudulent PPP loan applications on behalf of BELLAMY's referrals but that none of the loans were approved because, he believed, Bank Processor 1 had caught on to their scheme.

### *Emails and Text Messages Confirm BELLAMY's Knowing Participation in the Fraud*

28. As part of its investigation, law enforcement obtained communications between CHS 2 and BELLAMY, including text messages. I have reviewed a number of these communications, which discuss, among other things, BELLAMY's PPP loan and the loans for the individuals and companies he referred to CHS 2.

29. For example, on or about May 28, 2020 (the day the Drip Entertainment loan was funded), CHS 2 texted BELLAMY wiring instructions and stated that "[t]he amount to wire $311,641.67 [approximately 25% of the loan amount]." BELLAMY responded, "Sending wire now."

30. On June 15, 2020, CHS 2 texted BELLAMY about getting his PPP loan forgiven: "Josh Its [redacted] we need to start your forgiveness paperwork by wednesday of this week so i need you to send my 19,000 to complete all your docs your gonna need for all your employees You can send it to the same company you sent the other money to Let me know when you send it Thanks." Later that day, CHS 2 reminded BELLAMY: "[D]on't forget about the 19k for the forgiveness for the SBA need to have submitted by wednesday and you have 50 employees we need to get all there paper work in." Then, the next day, CHS 2 texted BELLAMY again about forgiveness: "Josh I have my crew working on the forgiveness package for you let me know when you can deposit the 19k I need to pay them we have to have all 49 employees entered by the end of tomorrow let me know." According to BELLAMY's bank records, on or about June 19, 2020, he wired $19,000 to one of CHS 2's bank accounts.

31. On or about May 30, 2020, BELLAMY sent a text message to CHS 2 with information about one of his referrals, including: (1) the individual's name, address, date of birth,

social security number, and e-mail address; (2) the individual's business name, business address, Federal Tax ID; and (3) bank account and routing numbers.

32. The next day, BELLAMY sent CHS 2 another text message with similar information regarding a second referral. BELLAMY then stated as to this referral: "What's up [redacted] this is my big brother [redacted] can you help him thru the process and kind of explain the whole thing[?]"

33. On June 5, 2020, BELLAMY sent CHS 2 a text message, "What's up [redacted] how is everything going." CHS 2 responded to BELLAMY, "Very slow a lot of declines we think bluevine is out of cash but were still waiting." BELLAMY replied, "Ok."

### *BELLAMY's Banking Activity Confirms His Knowing Participation in the Fraud*

34. I have also reviewed BELLAMY's bank records, which confirm BELLAMY's receipt and use of the PPP loan proceeds. Specifically, on or about May 28, 2020, Bank 2 wired the loan amount, $1,246,565, into BELLAMY's personal account, which, at the time, had a balance of only $2.51. That same day, BELLAMY wired $311,641.67 (approximately 25% of the loan proceeds) to one of CHS 2's bank accounts.

35. Thereafter, in just over two months' time, BELLAMY spent nearly all of the remaining loan proceeds. Based on my review of the bank records, it does not appear that much, if any, of the proceeds went to business or payroll related expenditures. For example, there are a number of large withdrawals, including two withdrawals totaling approximately $69,800 on June 1, 2020, a $30,000 withdrawal on June 2, 2020, a $20,000 withdrawal on June 6, 2020, a $10,000 withdrawal on June 13, 2020, and then two withdrawals totaling approximately $33,000 on June 15, 2020. In total, bank records show BELLAMY withdrew approximately $302,800 between May 28, 2020 and July 28, 2020.

36. BELLAMY's bank records also reflect what appear to be purchases of jewelry and other luxury items. For example, on June 2, 2020, BELLAMY sent a wire transfer of $57,000 to a custom jewelry store, and on June 3, 2020, he sent a $38,000 wire transfer to another jewelry store. On June 8, 2020, BELLAMY purchased $5,381.60 in goods at Gucci and $1,020.98 at Milano Exchange. On June 14, 2020, BELLAMY spent $2,014.80 at Dior.

37. BELLAMY's bank records also reflect a number of expenditures for what appears to be travel and hotels. From May 28 to July 24, 2020, BELLAMY spent over $6,630 on transactions with various airlines. He also spent approximately $62,774 at the Seminole Hard Rock Hotel and Casino.

### *BELLAMY's Phone Call with an Undercover Agent Confirms His Knowing Participation in the Fraud*

38. On or about August 3, 2020, an undercover agent ("UC3"), posing as an associate of one of the conspirators in the scheme, spoke with BELLAMY by telephone and claimed to be able to assist him with the forgiveness of his PPP loan and obtaining a second PPP loan for him.

39. During the call, BELLAMY told UC3 that he was trying to have his prior PPP loan forgiven and obtain another loan. UC3 asked BELLAMY for information about his company, supposedly in order to prepare the necessary paperwork. For example, UC3 asked about how many employees Drip Entertainment has. BELLAMY responded, "I got as many employees as I want." When UC3 stated he needed to write a specific number of employees on the form, BELLAMY instructed him to write 15 on the form. UC3 asked how many employees CHS 2 had put down on his prior application, and BELLAMY replied that he did not know. UC3 also asked whether, in the first application, CHS 2 told him it was a PPP loan. BELLAMY responded that CHS 2 did, in fact, tell him it was a PPP loan.

40. UC3 asked BELLAMY how much money he wanted this time, noting that $1.2 million would require about 50 employees. BELLAMY initially stated that he did not need that much and was only trying to get around $200,000. BELLAMY then asked if the application was going to be through Bank Processor 1 again. When UC3 stated that it was, BELLAMY told him to apply for another $1.2 million. UC3 noted that BELLAMY had previously told him to put down 15 employees on the form and that he would now need to put down 50 employees. BELLAMY responded, "Put 50 then." When UC3 mentioned that he would have to come up with 50 employees and BELLAMY would have to "break me off," BELLAMY responded, "I'm gonna break you off." UC3 told BELLAMY that he would come up with names of employees to include in the paperwork, to which BELLAMY asked, "You're gonna need some names?" UC3 responded that he (UC3) would take care of that, and BELLAMY stated, "You can say 50."

41. When UC3 asked how he had spent the PPP loan funds, BELLAMY stated that he was "buying stuff", wiring out money, and withdrawing money. He added that he made purchases for his "artists . . . doing videos and stuff like that."

42. During the call, BELLAMY agreed to pay UC3 35% of the new loan proceeds – 10% for his work to obtain forgiveness of the first PPP loan and 25% for obtaining the second PPP loan – once he receives the funds.

43. At the end of the call, BELLAMY stated he had additional people to refer to UC3 for loans, including his girlfriend, his mom, and his brother. He added that CHS 2 had not done anything for them yet.

## CONCLUSION

44. Based on the forgoing, I respectfully submit that there is probable cause to believe that JOSHUA BELLAMY committed the Target Offenses.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
MICHAEL BENIVEGNA
Special Agent
IRS-CI

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this __9th__ Day of September, 2020

_____
HON. ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE