UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-60064-CR-RKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| v. | § | |
| JOSHUA BELLAMY, | § | |
| Defendant. | § | |
| _____/ | | |

## DEFENDANT'S MOTION FOR SANCTIONS AND SUGGESTED REMEDY

**COMES NOW** the Defendant, JOSHUA BELLAMY, by and through his undersigned counsel, and hereby respectfully requests that the court sanction the government for a blatant and prejudicial violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976), the Due Process Protections Act  (Public Law 116-182) and the Local Rules of Court for the Southern District of Florida. In this motion, the Defense also suggests a fair and appropriate sanction and remedy to send a message to the Department of Justice and to the United States Attorney's Office in the United States District Court for the Southern District of Florida that compliance with the Due Process Protections Act and our Local Rules is not optional.

## BACKGROUND AND BRIEF HISTORY

1.     The Defendant, Joshua Bellamy, does not wish to vacate his guilty plea, and has never suggested doing so. He is ready to be sentenced.

2.     Mr. Bellamy maintains his guilt to the charge he pled guilty to. He has and continues to fully accept responsibility for his illegal actions in connection with Paycheck

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 2 of 11

Protection Program ("PPP") loan fraud. He took United States government money that he clearly was not entitled to.

3.      Undersigned counsel and prosecutors Philip Trout of the Department of Justice and David Turken of the United States Attorneys Office for the Southern District of Florida spent approximately 10 months discussing and negotiating a possible plea in the instant case before the information was filed. The prosecutors presented their evidence of Mr. Bellamy's guilt as Mr. Bellamy was considering whether to accept a plea or go to trial. A major part of the government's evidence to induce Mr. Bellamy to enter a plea rather than proceed to trial was the expected testimony of the government's star witness, James Stote, the main perpetrator, leader, and organizer of the PPP fraud involving Mr. Bellamy and others similarly situated who have been charged separately.

4.      The pre-trial, pre-plea discussions began as early as August 26, 2020, when undersigned attorney Diego Weiner flew to Springfield, New Jersey to attend a meeting with his client, Josh Bellamy. Present for that meeting was Department of Justice Prosecutor Trout and Assistant United States Attorney Turken (both of whom appeared telephonically), and IRS Special Agent Sean Mayberry (who was present in person). The meeting was for Mr. Bellamy and his counsel to hear the government's evidence, and for Mr. Bellamy to consider and possibly begin cooperation with the government officials.

5.      As a result of almost 10 months of discussions regarding a possible plea of guilty versus going to trial, Mr. Bellamy, relying on the prosecutor's representations and fully accepting responsibility for what he did, elected to waive his right to a trial and to enter a guilty plea. After carefully considering the anticipated testimony of James Stote, final terms were agreed upon for the guilty plea by Josh Bellamy to a one-count information.

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 3 of 11

6.      Undersigned counsel, in attempting to render effective assistance of counsel, heavily relied upon the government's proffer of their evidence and limited discovery, especially as to Mr. Stote, in ultimately advising Mr. Bellamy to enter a plea of guilty. Never once did the prosecutors suggest any *Brady* type evidence regarding James Stote existed.

7.      On June 8, 2021, Mr. Bellamy and undersigned counsel signed his plea agreement and the factual proffer which was forwarded to Department of Justice Prosecutor Trout and Assistant United States Attorney Turken and to the courtroom deputy of the Honorable Roy Altman.

8.      The very next day, June 9, 2021, Mr. Bellamy changed his plea from not guilty to guilty before United States Magistrate Judge Patrick M. Hunt.[1] Mr. Bellamy entered his guilty plea without ever hearing of the devastating *Brady* evidence that the prosecutors withheld from the defense.

### THE FACTS and THE VIOLATION

9.      On September 20, 2021, two days before the Defendant's original sentencing date, undersigned counsel received an email from the prosecutors in this case, with a detailed news article about their star witness, James Stote. *See* **Composite Exhibit A**. Undersigned counsel then immediately spoke with the prosecutors who advised — for the first time — that James Stote would not be called by the government as a witness in the trials of other defendants similarly situated factually to Mr. Bellamy (nor at Mr. Bellamy's sentencing). In an effort to minimize the failure to provide Brady information, the prosecutors mentioned that Stote was not vital to proving the case against Mr. Bellamy. In the substantive part of the offense conduct section of the

---

[1] *Dkt.* 32.

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 4 of 11

Defendant's PSR, Stote is mentioned in 13 separate paragraphs. Stote was the architect, leader, and organizer of the offense. The fact remains that without Stote, the crime was not possible.

10.     It turns out that Mr. Stote was a convicted felon for several serious fraud and theft related offenses and that he was under active law enforcement investigation for his involvement in the murder of his brother-in-law, the burial of the body, and for allegedly then using his deceased brother-in-law's identity to commit numerous additional crimes, including significant financial crimes. Of course, Mr. Stote is also a cooperating defendant in PPP fraud cases in this district, in the Northern District of Ohio and possibly elsewhere.

11.     A definitive (and very interesting) article on Mr. Stote's murder-related crime spree was published in the South Florida Sun-Sentinel on September 9, 2021, and undersigned counsel invites the court to read that article. *See* **Exhibit B**.

12.     According to the Sun-Sentinel, the crime spree of James Stote involving the death of his brother-in-law began around May 2014. *In 2015,* the FBI was made aware of the fact that James Stote was using the decedent's bank accounts and committing other crimes in the name of the deceased.

13.     The body of Stote's brother-in-law, Donald Shoff, was not found until a death bed confession led the police to Mr. Shoff's body which was allegedly buried by James Stote after Stote's sister and possibly James Stote shot Mr. Shoff in the back of the head and killed him. Mr. Shoff's body was recovered on July 9, 2021. *See* **Exhibit B**.

14.     After the remains of Mr. Stote's murdered brother-in-law were recovered, Mr. Stote apparently began cooperating with law enforcement regarding the murder, burial, assumed identity and related crimes. *See* **Exhibit B**.

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 5 of 11

15.     Mr. Stote was involved in many recorded conversations for law enforcement, including under the supervision of the Broward County Sheriff's Office. He was and is actively cooperating with law enforcement authorities.

16.     In 2018, Mr. Stote was arrested for writing bad checks on the decedent's bank accounts. *See* **Exhibit B**.

17.     Mr. Stote is currently on probation for 2018 convictions for grand theft, grand theft auto and fraudulent use of personal identification. *See* **Exhibit B**.

18.     In the related case, in the Northern District of Ohio, in which Department of Justice prosecutor Philip Trout is the prosecutor. Stote was charged by information with one count of conspiracy to commit wire fraud (PPP loans) in violation of 18 U.S.C. § 1349.  He is scheduled to enter a guilty plea on December 14, 2021. *See* **Exhibit C.**

19.     None of the above information regarding Mr. Stote was relayed to undersigned counsel during the 10 months of discussions, not before Mr. Bellamy pled guilty, and not until two days before the Defendant's original sentencing date.

20.     After learning the horrific details about James Stote, it was clear that Mr. Bellamy and undersigned counsel had detrimentally relied on the prosecutor's deceptive assertions about Stote, his testimony and evidence, during the months the defendant was deciding whether to go to trial or enter a guilty plea.

## THE LAW

21.     On October 21, 2020, President Trump signed into law the Due Process Protections Act ("the Act") which amends Rule 5 of the Federal Rules of Criminal Procedure. The law passed the House of Representatives with broad bipartisan support and by unanimous consent in the Senate. The legislation reflected a recognition among our nation's elected officials that reform was

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 6 of 11

necessary to curtail prosecutorial misconduct by putting federal prosecutors on notice of their disclosure obligations at the outset of every case. The legislative history of the Act makes it very clear that Congress voted to require mandatory *Brady* related orders in every federal case because, prior to the Act, there were "inadequate safeguards in federal law" to ensure that prosecutors timely complied with their constitutionally mandated disclosure obligations. The Act provides specific possible consequences when prosecutors fail to comply with their obligations.

22.     We are fortunate to be in a District in which the vast majorities of prosecutors are honorable, and who understand their obligations under *Brady* and *Giglio*. Nevertheless, in this case, without casting any aspersions on the integrity of the prosecutors (who have been very professional), a clear and significant violation of the Act has occurred.

23.     Per order of the Chief Judge of the United States District Court for the Southern District of Florida, prosecutors are verbally admonished about obligations under the Act at every defendant's *first appearance* before a judge in this District, as is done in virtually every Federal District in the country.

> The government has a duty to disclose any evidence that goes to negating the defendant's guilt, the credibility of a witness, or *that would reduce a potential sentence* (emphasis added). The defendant is entitled to this information without a request. Failure to disclose exculpatory evidence in timely manner may result in consequences, including but not limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, disciplinary actions, or sanctions by the court.

24.     Regrettably, when undersigned counsel discussed this troubling situation with Messrs. Trout and Turken, they persisted in insisting that there was no violation of the Act, nor of the United States District Court for the Southern District of Florida Local Rules. They felt that they were under no obligation to provide the Stote-related *Brady* information during the 10 months of discussions with undersigned counsel and prior to the defendant entering a guilty plea.

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 7 of 11

25.     Instead of acknowledging their violations of the Act and our Local Rules, and working with defense counsel to fashion a remedy that is fair to both sides (keeping in mind that the defense always acknowledged Mr. Bellamy's guilt, his acceptance of responsibility for his crime, and never suggested withdrawing his guilty plea), the prosecutors maintained and continue to state that nothing wrong was done by them. The prosecutors are arguing that they did not need to turn over the required *Brady* related information and evidence or to be candid with defense counsel about Stote unless there was going to be a trial; in other words, they believe that they can misrepresent and withhold evidence during discussions involving a *possible* plea, much as police can lie to suspects to get confessions. The fact that they, and we, are lawyers and officers of the court seems to be irrelevant to them. So, this court's intervention is needed.

26.     If the court determines that a violation of the Act and our Local Rules has, in fact, occurred, consequences should include sanctions that are just under the circumstances. In fashioning an appropriate remedy, the court should consider the seriousness of the violation, its impact on Mr. Bellamy's case and the deterrent effect of the court's response to the violation.

27.     Undersigned counsel is aware of the case of *U.S. v. Ruiz*, 536 U.S. 622 (2002), which held that "the Constitution does not require prosecutors to disclose impeachment information prior to entering into a plea agreement with a criminal defendant." *id.* At first blush, that case would indicate that prosecutors can withhold favorable material information from the Defense when negotiating a guilty plea, but not if the case is in a trial posture. *See id.* However, the holding in *Ruiz* is not applicable in the case *sub judice* for several reasons. First, the case was decided in 2002, many years before the Act and our modified Local Rules. Additionally, in the *Ruiz* case, the plea agreement signed by the defendant included a waiver of any information or

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 8 of 11

evidence that the government possessed regarding any affirmative defense. *See id.* There is no such waiver in the case *sub judice*.

28.     Judges and lawyers refer to *Brady v. Maryland*, 373 U.S. 83 (1963), for the holding that prosecutors have an affirmative duty to seek out and provide to the defense all material evidence that is favorable to the accused that is known to the government or to federal, state, or local law enforcement personnel. In *U.S. v. Agurs*, 427 U.S. 97, 108 (1976), the Court held that a "prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id*.

29.     The duty to disclose favorable evidence includes mandatory disclosure of information that impeaches the credibility of government witnesses. *U.S. v. Bagley*, 473 U.S. 667, 682 (1985). Evidence that is potentially helpful to the defendant at his or her sentencing should be disclosed regardless of whether the sentencing follows a plea or a trial. Relevant and material evidence which will aid the defendant during plea negotiations, trial, or sentencing must be disclosed on a timely basis to the defendant. See *U.S. v. Rainey*, No. 12-cr-291, DKT.172 (E.D. La. Aug.11 2014).[2]

        The prosecutors in this case are stating that they can withhold material favorable evidence during plea negotiations when the decision has not been made by the defendant as to whether he or she will enter a guilty plea or go to trial. This is the case before the court. Months of negotiation took place before Mr. Bellamy finally agreed to enter a plea – based in large measure on the government's representations regarding James Stote. Had the defense known about Stote's

---

[2] In *Rainey*, Judge Kurt Englehardt (then a district court judge now on the Fifth Circuit) issued a lengthy discovery order governing the prosecutions mandatory disclosure of exculpatory information to the defense including any information or evidence that "may appear to be favorable to the defendant…with respect to…any preliminary matter, or the potential sentence..."

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 9 of 11

extensive criminal activities, undersigned counsel may well have been able to negotiate a more favorable plea for Mr. Bellamy, or Mr. Bellamy could have decided to proceed to trial.[3]

## **THE SUGGESTED REMEDY**

30.     Mr. Bellamy committed a crime and must be punished for it. However, he was directly prejudiced by the government's intentional discovery violations. The violation colored every aspect of his case, and the ultimate decision of whether the Defendant should plead guilty or proceed to trial. The calculation of who would be the witnesses, what evidence, documents and conversations would be admitted into evidence, all formed part of undersigned counsels' advice to Mr. Bellamy.

31.     When Mr. Bellamy made the decision to accept responsibility for his crime, every aspect of the plea negotiations was affected by the government's discovery violations. Undersigned counsel was denied the ability to effectively negotiate vital factors related to the ultimate sentence the Defendant would receive such as the factual proffer, the "loss" amount, and any sentencing enhancements were directly affected by undersigned counsels' inability to negotiate a more beneficial plea under the circumstances which, obviously affects the Defendant's potential sentence.

---

[3] In the case at Bar, after the *Brady* information about Stote was revealed, the prosecutors stated to undersigned counsel that they believed that they could get some of the evidence that Stote would have testified to admitted, even without Stote. Their belief certainly does not justify their failure to provide favorable evidence regarding Stote in a timely fashion. The proper procedure under the Act and the Local Rule is that the so-called "*Brady* material" must be disclosed immediately and certainly in time for its effective use during a trial, in plea proceedings and during sentencings. "The government cannot with its right hand say it has nothing while its left hand holds what is of value." *U.S. v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995).

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 10 of 11

32.     The person who was truly prejudiced by the government's actions (or inactions) was Mr. Bellamy, and therefore his sentence should be adjusted accordingly.

33.     Clearly a message must be sent to the Department of Justice and the United States Attorney's Office for the United States District Court for the Southern District of Florida.

34.     Undersigned counsel asks this court to sentence Mr. Bellamy to a period of 12 months and 1-day incarceration, followed by 12 months of house arrest, followed by 3 years of supervised release. Please note that it is the defense counsel's belief that the sentence originally requested was and is appropriate pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a) and the testimony and evidence which will be presented at Mr. Bellamy's sentencing. The sentence requested is even more appropriate given the matters stated herein.

**WHEREFORE,** based upon the foregoing and additional arguments to be made at the time of sentencing, the Defendant JOSHUA BELLAMY, by and through his undersigned counsel, respectfully requests that this court grant his motion for sanctions, and sentence the Defendant to a period of 12 months and 1-day incarceration, followed by 12 months house arrest, followed by 3 years of supervised release.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record this 3rd day of December 2021.

Respectfully submitted,

JEFFREY S. WEINER, P.A.
ATTORNEYS AT LAW
Two Datran Center, Suite 1910
9130 South Dadeland Blvd.
Miami, Florida 33156-7858

*United States of America v. Joshua Bellamy*
Case No. 21-60064-CR-RKA
Defendant's Motion for Sanctions and Suggested Relief
Page 11 of 11

305 670-9919
305 670-9299 Fax
lawfirm@jeffweiner.com

By:   */s/Jeffrey S. Weiner*
      JEFFREY S. WEINER, ESQUIRE
      Florida Bar No. 185214

By:   */s/Annabelle Nahra Nadler*
      ANNABELLE NAHRA NADLER, ESQUIRE
      Florida Bar No. 96072

By:   */s/ Diego Weiner*
      DIEGO WEINER, ESQUIRE
      Florida Bar No. 122454

By:   */s/ Yisel Villar*
      YISEL VILLAR, ESQUIRE
      Florida Bar No. 1015657

**Composite Exhibit A**

**From:** **Trout, Philip (CRM)** Philip.Trout@usdoj.gov ✇
**Subject:** US v. Bellamy
**Date:** September 20, 2021 at 12:05 PM
**To:** Annabelle Nahra annabelle@jeffweiner.com, Diego Weiner diego@jeffweiner.com
**Cc:** Turken, David (USAFLS) David.Turken@usdoj.gov

Annabelle and Diego,

We wanted to make you aware of the following recent news article that contains criminal allegations as to James Stote, who is a cooperating source in the above case against your client: https://www.sun-sentinel.com/news/crime/fl-ne-donald-shoff-murder-20210909-3y42kxmumfcj3fbegzawclodmi-story.html (copy of article in .pdf attached).   In addition, we wanted to direct you to the following Florida state criminal case filed in Broward County: 21008334CF10A. The online criminal docket contains related publicly available case filings, including a probable cause affidavit.

Phil

Philip Trout
Trial Attorney, Fraud Section
Criminal Division, United States Department of Justice
1400 New York Avenue, NW
Washington, DC 20530
202-616-6989



Jim Stote Sun
Sentin...21.pdf

SECTIONS

Months of secrecy end as state releases COVID death toll for every county



Tropical storms Odette and Peter could develop; forecasters watch for new tropical wave



Hidden h
hour dat
North Be

‹  ›

ADVERTISEMENT

CRIME NEWS    NEWS

# Death-bed confession leads police to a long-buried body, a sister's arrest and a twisted tale of stolen ID

By **EILEEN KELLEY and ANGIE DIMICHELE**
SOUTH FLORIDA SUN SENTINEL   |   SEP 09, 2021

 

For years, Donald Shoff's own mother and younger sister thought he fled the country on a boat with two duffel bags stuffed with a million in cash.

But the truth was that Shoff, a felon who was rebuilding his life in real estate, had been **buried in one of his rental yards** by his brother-in-law and another sister after she killed him, according to a death-bed confession, court records reveal.

ADVERTISEMENT

In death, Shoff seemingly continued to run a business, buy, sell and rent out houses with his sister. That's because James Stote assumed his brother-in-law's identity, siphoning off the dead man's bank account starting around May 2014.

On occasion, Stote would even tell his wife, Dara, that he saw her brother when he popped in from Colombia, where, Stote said, Shoff was living under an assumed name.

Dara Stote, who filed for divorce in 2016, apparently bought the tales until a year later. That's when she and her mother went to the FBI to say her estranged husband was using her brother's identity and that she hadn't seen or heard from her brother in years.

The secret of the killing and stashed body stayed a secret among a small group for years. And then someone got sick.

When close to death, Siegfried Mahar called an ex-cop and told him what he knew: Darlene Shoff-Brock shot her brother in the back of the head and then she and Stote buried him in a yard. Mahar even drew a map pinpointing the spot where detectives could find the grave, court records say.

Shoff's bones were recovered on July 9 on the side of a Dania Beach house he and his mother bought in 2011. In 2014, at the time of Shoff's death, Stote was living at the home with Mahar, the man who would later become sick and eventually clear his conscience, the just-released records say.

A month later, after DNA came back as a match for Shoff, Darlene Shoff-Brock, 62, of Tamarac, was **arrested on a first-degree murder charge**. Stote, 55, remains a free man. He is a former business partner and convicted fraudster who admitted to investigators that he helped Shoff-Brock bury her brother's body before assuming his identity.

TIMELINE: A brother shot, his body buried, and an arrest years later »

Stote cooperated with authorities by agreeing to call Shoff-Brock in a recorded conversation to bring up what happened seven years ago. Stote

went on to record many more conversations, which he handed over to the Broward Sheriff's Office, court records show.

Even so, officials with the Broward State Attorney's Office say they made no deal offering Stote immunity for his cooperation. They won't address why he has not been arrested or whether charges are forthcoming.

"Prosecutors have not provided James Stote with any kind of immunity for any possible criminal conduct," spokeswoman Paula McMahon said. "It's not appropriate for us to speculate about potential charges in any investigation, including this one. Prosecutors will make any appropriate comments about the case in the courtroom as the case proceeds through the justice system."

David Magilligan, Stote's attorney, declined to comment. And Bruce Raticoff, Shoff-Brock's attorney, said he believes more information about Stote's involvement will come out. He said is not aware of any agreement with the State Attorney's Office not to prosecute Stote.



James Stote admitted to helping Darlene Shoff-Brock bury her brother's remains in the backyard of a home in Dania Beach. He was previously sentenced to prison in 2018 for grand theft, grand theft auto and fraudulent use of personal identification. (Florida Department of Corrections)

Stote began the supervised call by asking Shoff-Brock if she still had the gun used to shoot Shoff, records say. He told Shoff-Brock he had been by the Dania Beach home and he saw Broward Sheriff's Office personnel digging there, the warrant for Shoff-Brock's arrest says.

She sighed.

"You couldn't tell where though, right?" Shoff-Brock said to Stote.

"They're real close to the spot," Stote replied.

She sighed again and told him not to say anything else, the affidavit says. Stote then told Shoff-Brock that "somebody knows something and is talking."

That person, Mahar, is now dead. He died on July 6, just three days before the phone call; it was also the day Shoff's skeletal remains were found.

Efforts to reach Mahar's family, or the retired North Miami Beach cop who went to Broward Sheriff's Office detectives with Mahar's death-bed confession, were not successful.

RELATED: He bought property and wrote a bad check. But his sister had already killed him, cops say »

In the supervised call, Shoff-Brock and Stote discussed Mahar possibly having tipped officers off about the body.

Stote told detectives that Mahar was not there when Shoff was murdered but that he arrived while they "were cleaning it up," the affidavit says. Stote told detectives Mahar went to Home Depot to get lye to put on the body while they dug the grave.

When detectives wanted to talk to Mahar in June, he was hospitalized in a coma and on a ventilator, records say.

When they reached Shoff-Brock to question her about her brother, she said he had been out of the country for "the last couple of years," the affidavit says.

Stote told detectives that shortly before Shoff's murder, Shoff-Brock approached him saying she wanted her brother "taken out," the affidavit says. Stote claims Shoff-Brock even gave him a gun to do the job. When he refused, he said Shoff-Brock said she and a man named Peter Archer would do it instead. Archer died in 2018.

RELATED: Sister accused of shooting brother in the head and burying him in backyard »

On the night Shoff was killed, he, Shoff-Brock and Stote met at Shoff's home in Hollywood. Stote said the siblings argued over money, as they frequently did, Stote told detectives.

Stote said he left only to come back and find Shoff lying on the kitchen floor, covered in blood, the affidavit says.

Archer shot him, Stote claims Shoff-Brock told him. But Stote told detectives Shoff-Brock was the only person at the home when he arrived to find Shoff dead.

Leaving him on the floor, Stote told detectives he and Shoff-Brock drove to Dania Beach to dig the grave. He also admitted to getting rid of the gun Shoff-Brock allegedly gave him.

Four years later in 2018, Stote was arrested for writing bad checks on Shoff's bank accounts, records say. Investigators, having no idea that Shoff was long dead and buried, thought Shoff was in on the bad check scheme and issued a warrant for his arrest.



**Breaking News Alerts Newsletter**
As it happens

Get updates on the coronavirus pandemic and other news as it happens with our f

At the time of Shoff-Brock's August arrest, the Sheriff's Office would not comment about whether Stote was a person of interest after the South Florida Sun Sentinel reviewed an assortment of records and connected Stote to the Shoff family. The arrest affidavit, recently made public, confirms the connection.

RELATED: Businessman accused of $7 million in fraudulent coronavirus relief loans »

On Wednesday, Shoff-Brock pleaded not guilty to the charge of first-degree murder. Raticoff, her attorney, says much more will come out in court and that he believes his client is innocent.

**LATEST CRIME NEWS**

Ex-UM professor charged with shipping genetic equipment to Iran in violation of U.S. sanctions



West Palm Beach teenager hit speeds of 100 mph, ran red light, before crash that killed 4, sheriffs officials say



Florida congressional candidate says Republican rival threatened her life



"Here she is left holding the ball. ... At this point, everyone has heard one side of the story," Raticoff said.

ADVERTISEMENT

If Stote is not arrested for his alleged involvement, he is not free of legal problems. Stote is currently on probation for a 2018 conviction for grand theft, grand theft auto and fraudulent use of personal identification.

ADVERTISEMENT

He was **charged last summer** with wire fraud, bank fraud and conspiracy to commit wire fraud after making fraudulent applications for COVID-19 Paycheck Protection Program funds. His cases are pending.

*Eileen Kelley can be reached at 772-925-9193 or* **ekelley@sunsentinel.com** *Follow on Twitter @reporterkell.*

ADVERTISEMENT

**CONNECT**

   

**TRIBUNE PUBLISHING**

Chicago Tribune

**COMPANY INFO**

The Baltimore Sun

New York Daily News

Orlando Sentinel

Contact the Newsroom

The Morning Call of Pa.

Careers

Hartford Courant

Copyright © 2021, South Florida Sun-Sentinel

**Exhibit B**

SECTIONS

Months of secrecy end as state releases COVID death toll for every county



Tropical storms Odette and Peter could develop; forecasters watch for new tropical wave



Hidden l
hour date
North Be

‹  ›

ADVERTISEMENT

CRIME NEWS     NEWS

# Death-bed confession leads police to a long-buried body, a sister's arrest and a twisted tale of stolen ID

By EILEEN KELLEY and ANGIE DIMICHELE
SOUTH FLORIDA SUN SENTINEL  |  SEP 09, 2021

    

For years, Donald Shoff's own mother and younger sister thought he fled the country on a boat with two duffel bags stuffed with a million in cash.

But the truth was that Shoff, a felon who was rebuilding his life in real estate, had been **buried in one of his rental yards** by his brother-in-law and another sister after she killed him, according to a death-bed confession, court records reveal.

ADVERTISEMENT

In death, Shoff seemingly continued to run a business, buy, sell and rent out houses with his sister. That's because James Stote assumed his brother-in-law's identity, siphoning off the dead man's bank account starting around May 2014.

On occasion, Stote would even tell his wife, Dara, that he saw her brother when he popped in from Colombia, where, Stote said, Shoff was living under an assumed name.

Dara Stote, who filed for divorce in 2016, apparently bought the tales until a year later. That's when she and her mother went to the FBI to say her estranged husband was using her brother's identity and that she hadn't seen or heard from her brother in years.

The secret of the killing and stashed body stayed a secret among a small group for years. And then someone got sick.

When close to death, Siegfried Mahar called an ex-cop and told him what he knew: Darlene Shoff-Brock shot her brother in the back of the head and then she and Stote buried him in a yard. Mahar even drew a map pinpointing the spot where detectives could find the grave, court records say.

Shoff's bones were recovered on July 9 on the side of a Dania Beach house he and his mother bought in 2011. In 2014, at the time of Shoff's death, Stote was living at the home with Mahar, the man who would later become sick and eventually clear his conscience, the just-released records say.

A month later, after DNA came back as a match for Shoff, Darlene Shoff-Brock, 62, of Tamarac, was **arrested on a first-degree murder charge**. Stote, 55, remains a free man. He is a former business partner and convicted fraudster who admitted to investigators that he helped Shoff-Brock bury her brother's body before assuming his identity.

TIMELINE: A brother shot, his body buried, and an arrest years later »

Stote cooperated with authorities by agreeing to call Shoff-Brock in a recorded conversation to bring up what happened seven years ago. Stote

went on to record many more conversations, which he handed over to the Broward Sheriff's Office, court records show.

Even so, officials with the Broward State Attorney's Office say they made no deal offering Stote immunity for his cooperation. They won't address why he has not been arrested or whether charges are forthcoming.

"Prosecutors have not provided James Stote with any kind of immunity for any possible criminal conduct," spokeswoman Paula McMahon said. "It's not appropriate for us to speculate about potential charges in any investigation, including this one. Prosecutors will make any appropriate comments about the case in the courtroom as the case proceeds through the justice system."

David Magilligan, Stote's attorney, declined to comment. And Bruce Raticoff, Shoff-Brock's attorney, said he believes more information about Stote's involvement will come out. He said is not aware of any agreement with the State Attorney's Office not to prosecute Stote.



James Stote admitted to helping Darlene Shoff-Brock bury her brother's remains in the backyard of a home in Dania Beach. He was previously sentenced to prison in 2018 for grand theft, grand theft auto and fraudulent use of personal identification. (Florida Department of Corrections)

Stote began the supervised call by asking Shoff-Brock if she still had the gun used to shoot Shoff, records say. He told Shoff-Brock he had been by the Dania Beach home and he saw Broward Sheriff's Office personnel digging there, the warrant for Shoff-Brock's arrest says.

She sighed.

"You couldn't tell where though,

right?" Shoff-Brock said to Stote.

"They're real close to the spot," Stote replied.

She sighed again and told him not to say anything else, the affidavit says. Stote then told Shoff-Brock that "somebody knows something and is talking."

That person, Mahar, is now dead. He died on July 6, just three days before the phone call; it was also the day Shoff's skeletal remains were found.

Efforts to reach Mahar's family, or the retired North Miami Beach cop who went to Broward Sheriff's Office detectives with Mahar's death-bed confession, were not successful.

RELATED: He bought property and wrote a bad check. But his sister had already killed him, cops say »

In the supervised call, Shoff-Brock and Stote discussed Mahar possibly having tipped officers off about the body.

Stote told detectives that Mahar was not there when Shoff was murdered but that he arrived while they "were cleaning it up," the affidavit says. Stote told detectives Mahar went to Home Depot to get lye to put on the body while they dug the grave.

When detectives wanted to talk to Mahar in June, he was hospitalized in a coma and on a ventilator, records say.

When they reached Shoff-Brock to question her about her brother, she said he had been out of the country for "the last couple of years," the affidavit says.

Stote told detectives that shortly before Shoff's murder, Shoff-Brock approached him saying she wanted her brother "taken out," the affidavit says. Stote claims Shoff-Brock even gave him a gun to do the job. When he refused, he said Shoff-Brock said she and a man named Peter Archer would do it instead. Archer died in 2018.

RELATED: Sister accused of shooting brother in the head and burying him in backyard »

On the night Shoff was killed, he, Shoff-Brock and Stote met at Shoff's home in Hollywood. Stote said the siblings argued over money, as they frequently did, Stote told detectives.

Stote said he left only to come back and find Shoff lying on the kitchen floor, covered in blood, the affidavit says.

Archer shot him, Stote claims Shoff-Brock told him. But Stote told detectives Shoff-Brock was the only person at the home when he arrived to find Shoff dead.

Leaving him on the floor, Stote told detectives he and Shoff-Brock drove to Dania Beach to dig the grave. He also admitted to getting rid of the gun Shoff-Brock allegedly gave him.

Four years later in 2018, Stote was arrested for writing bad checks on Shoff's bank accounts, records say. Investigators, having no idea that Shoff was long dead and buried, thought Shoff was in on the bad check scheme and issued a warrant for his arrest.

 **Breaking News Alerts Newsletter**
As it happens

Get updates on the coronavirus pandemic and other news as it happens with our f

At the time of Shoff-Brock's August arrest, the Sheriff's Office would not comment about whether Stote was a person of interest after the South Florida Sun Sentinel reviewed an assortment of records and connected Stote to the Shoff family. The arrest affidavit, recently made public, confirms the connection.

RELATED: Businessman accused of $7 million in fraudulent coronavirus relief loans »

On Wednesday, Shoff-Brock pleaded not guilty to the charge of first-degree murder. Raticoff, her attorney, says much more will come out in court and that he believes his client is innocent.

**LATEST CRIME NEWS**

Ex-UM professor charged with shipping genetic equipment to Iran in violation of U.S. sanctions



West Palm Beach teenager hit speeds of 100 mph, ran red light, before crash that killed 4, sheriffs officials say



Florida congressional candidate says Republican rival threatened her life



"Here she is left holding the ball. ... At this point, everyone has heard one side of the story," Raticoff said.

ADVERTISEMENT

If Stote is not arrested for his alleged involvement, he is not free of legal problems. Stote is currently on probation for a 2018 conviction for grand theft, grand theft auto and fraudulent use of personal identification.

ADVERTISEMENT

He was **charged last summer** with wire fraud, bank fraud and conspiracy to commit wire fraud after making fraudulent applications for COVID-19 Paycheck Protection Program funds. His cases are pending.

*Eileen Kelley can be reached at 772-925-9193 or* **_ekelley@sunsentinel.com_** *Follow on Twitter @reporterkell.*

ADVERTISEMENT

**CONNECT**

   

**TRIBUNE PUBLISHING**

Chicago Tribune

**COMPANY INFO**

New York Daily News

The Baltimore Sun

Copyright © 2021, South Florida Sun-Sentinel

Orlando Sentinel

Contact the Newsroom

Careers

The Morning Call of Pa.

Hartford Courant

**Exhibit C**

**FILED**

NOV 10 2021

Clerk of Court, United States District Court
Ohio Northern District - CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) I N F O R M A T I O N |
| | ) |
| Plaintiff, | ) |
| | ) **1 : 21  CR  805** |
| v. | ) CASE NO. |
| | ) Title 18, United States Code, |
| JAMES RICHARD STOTE, | ) Section 1349 |
| PHILLIP J. AUGUSTIN, | ) |
| | ) **JUDGE BARKER** |
| Defendants. | ) |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

The Paycheck Protection Program

1.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

2.     In order to obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application (Small Business Administration ("SBA") Form 2483), the small

business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

3.     A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

4.     PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

<u>The Defendants and Related Entities and Individuals</u>

5.     JAMES RICHARD STOTE was a resident of Broward County, Florida. STOTE was the true owner of FS Financial, Inc., and USA Homes and Remodeling, Inc. FS Financial, Inc. had been in the business of providing credit-related services, such as improving credit scores and obtaining commercial loans. USA Homes and Remodeling, Inc. was a corporate entity with minimal legitimate operations.

6.     PHILLIP J. AUGUSTIN was a resident of Broward County, Florida. AUGUSTIN was the true manager and one of the true owners of Clear Vision Music Group ("Clear Vision") and Top Gun Consulting and Management LLC ("Top Gun"). Clear Vision and Top Gun had limited operations prior to the COVID-19 pandemic.

7.     Ross Charno (charged separately) was a resident of Broward County, Florida. Charno was the true owner of PM Autobody, Inc. ("PM Autobody") and OMP Enterprises LLC ("OMP"), two entities with minimal legitimate operations.

8.     Wyleia Nashon Williams (charged separately) was a resident of Broward County, Florida.

9.     Deon D. Levy (charged separately) was a resident of Bedford Heights, Ohio. Levy was the true owner and manager of Apex Now Corp. ("Apex Now") and Urban Housing Group LLC ("Urban Housing").

10.     Apex Now was an Ohio corporation with its listed principal address in Solon, Ohio, which performed construction services in Northeast Ohio and elsewhere.

11.     Urban Housing was an Ohio corporation with its listed principal address in Highland Heights, Ohio, which had limited operations, but performed some construction services in Northeast Ohio.

12.     Bank Processor 1 was a third-party company processor, based in Redwood City, California, that processed PPP loan applications for participating lender banks. Members of the public could access an online portal for applying for PPP loans through Bank Processor 1's website, and it received applications through that portal submitted to its servers located in California.

3

## COUNT 1
(Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349)

The Acting United States Attorney charges:

13.     The allegations contained in paragraphs 1 through 12 of this Information are incorporated by reference as if stated fully herein.

### The Conspiracy and Scheme to Defraud

14.     From in or around March 2020, and continuing through in or around June 2020, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants JAMES RICHARD STOTE and PHILLIP J. AUGUSTIN, and Ross Charno (charged separately), Wyleia Nashon Williams (charged separately), and Deon D. Levy (charged separately), did willfully, that is, with the intent to further the object of the conspiracy, knowingly combine, conspire, confederate, and agree together and with each other and with others known and unknown to the Acting United States Attorney, to commit an offense against the United States, that is, to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

### Purposes of the Scheme

15.     The purposes of the scheme included, but were not limited to, the following: for Defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting, and causing to be submitted, false and fraudulent applications for loans and grants made available through the SBA to provide relief for the economic effects caused by the COVID-

4

19 pandemic, including PPP loans; (b) offering, paying, and receiving kickbacks in return for the submission of false and fraudulent loan applications; and (c) diverting fraud proceeds for the Defendants' and co-conspirators' personal use, the use and benefit of others, and to further the conspiracy.

Manner and Means of the Scheme

16.     The manner and means by which Defendants and their co-conspirators carried out the scheme included, but were not limited to, the following:

a.     STOTE, AUGUSTIN, Charno, and other co-conspirators submitted and caused to be submitted fraudulent PPP loan applications for entities under their control, including USA Homes and Remodeling, Inc., FS Financial, Inc., Clear Vision, Top Gun, PM Autobody, and OMP.

b.     STOTE, AUGUSTIN, Charno, and other co-conspirators, solicited and recruited confederate borrowers, for whom they submitted and caused to be submitted fraudulent PPP loan applications, including for Apex Now and Urban Housing.

c.     STOTE, AUGUSTIN, and Charno also worked with other co-conspirators to recruit additional confederate borrowers interested in obtaining PPP loans.

d.     STOTE coordinated submitting the fraudulent PPP applications, largely through Bank Processor 1's online applications portal, but occasionally through other processors of PPP loan applications for participating PPP lenders.  In most instances, STOTE used the confederate borrower's email to create an account with Bank Processor 1, which the borrower would then validate.  In some instances, STOTE used email accounts he had created and controlled to create an account for the borrower with Bank Processor 1.  The PPP loan applications included falsified payroll tax forms and falsified bank statements, and the application materials falsely and

5

fraudulently represented the borrowing entities' operations and finances, including the number of employees and the amount of monthly payroll.

      e.    STOTE and Charno falsified documents that were submitted, and were intended to be submitted, in support of the applications, which falsely reported the number of employees and the payroll expenses, choosing figures to yield a PPP loan in the amount desired. The falsified payroll figures were determined based on a formula in which the desired PPP loan amount was equal to the average monthly payroll expenses for 2019, multiplied by 2.5. In particular, STOTE and Charno created falsified Internal Revenue Service ("IRS") Forms 941 (titled, "Employer's Quarterly Federal Tax Return") for all four quarters of 2019 in support of the applications.

      f.    Williams assisted AUGUSTIN's efforts to recruit confederate borrowers and to gather information and documents from those borrowers to provide to STOTE for use in the fraudulent PPP applications.

      g.    From time to time, AUGUSTIN, STOTE, and Charno arranged with the confederate borrowers for the borrowers to pay 25% of the amount of the PPP loan as a fee or kickback for obtaining the loan, to be wired to accounts controlled by STOTE.

      h.    From time to time, STOTE wired to accounts controlled by AUGUSTIN, or otherwise transferred to AUGUSTIN's designees, a share of the 25% kickbacks.

      i.    STOTE, AUGUSTIN, Charno, Williams, Levy, and other co-conspirators coordinated their efforts, including obtaining information and documents from confederate borrowers and submitting fraudulent PPP loan applications, through the use of interstate wire communications.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE

17.     The allegations of Count 1 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  As a result of the foregoing offense, Defendants JAMES RICHARD STOTE and PHILLIP J. AUGUSTIN shall forfeit to the United States all property, real and personal, which constitutes—or is derived from—proceeds traceable to the commission of the offense; including, but not limited to, the following:

a.      $1,107,715.13 seized pursuant to the execution of a federal seizure warrant on or about June 25, 2020, from CITI Bank Personal Savings Account No. ******3778.  The account is in the name of JAMES STOTE.

b.      $30,000.00 U.S. currency seized on or about June 25, 2020, pursuant to the execution of a search warrant at the residence of STOTE located in or around Hollywood, Florida.

c.      Rolex watch (man's) – with gold and silver band - seized on June 25, 2020, pursuant to the execution of a search warrant at residence of STOTE located in Hollywood, Florida.  The face of the watch reads: Rolex, Oyster Perpetual, Datejust, Superlative Chronometer, Officially Certified.

d.      Rolex watch (man's) – with gold and silver band and gold face with diamonds - seized on June 25, 2020, pursuant to the execution of a search warrant at residence of STOTE located in Hollywood, Florida.  The face of the watch reads: Rolex, Oyster Perpetual, Date, Superlative Chronometer, Officially Licensed.

e.      Rolex watch (woman's) - with gold and silver band and diamonds around the face of the watch - seized on June 25, 2020, pursuant to the execution of a search warrant at

7

residence of STOTE located in Hollywood, Florida. The face of the watch reads: Rolex, Oyster Perpetual, Datejust, Officially Certified, Swiss Made.

f.      Rolex watch (man's) – with silver band - seized on June 25, 2020, pursuant to the execution of a search warrant at residence of STOTE located in Hollywood, Florida. The face of the watch reads: Rolex, Oyster Perpetual, Submariner, 1000 ft=300 m, Officially Certified, Swiss-t, <25, Date. Back of the watch face: green holographic in color with the numbers 16233.

g.      Rolex watch (man's) – with gold and silver band and blue face with date - seized on June 25, 2020, pursuant to the execution of a search warrant at residence of STOTE located in Hollywood, Florida. The face of the watch reads: Rolex, Oyster, Perpetual. The bottom of the face reads: Submariner, 1000 ft 300m, Superlative Chronometer, Officially Certified.

h.      Gold braided/linked bracelet seized on June 25, 2020, pursuant to the execution of a search warrant at residence of STOTE located in Hollywood, Florida.

i.      Gold braided/linked necklace – with 14k Italy on clasp - seized on June 25, 2020, pursuant to the execution of a search warrant at residence of STOTE located in Hollywood, Florida.

j.      Silver in color ring with diamonds down both sides of the band. A large, square in shape, diamond is set in the top/middle of the ring. (Note: The stones appear to be diamonds; however, the ring has not yet been appraised by an authorized jeweler to confirm). The ring was turned over by STOTE to the FBI in Miami, Florida, on or about October 26, 2021.

k.      Gold rope necklace and a "hamsa hand" charm with diamonds and secured with a lobster claw clasp. (Note: The stones appear to be diamonds; however, the necklace has

not yet been appraised by an authorized jeweler to confirm). The necklace was turned over by STOTE to the FBI in Miami, Florida, on or about October 28, 2021.

      l.     All contents (approximately $271,588.28) of Fifth Third Bank account number ******2627. The account is in the name of 60 Days Funding and Investment Group. AUGUSTIN is the authorized representative of 60 Days Funding and Investment Group.

      m.     All contents (approximately $8,681.07) of Fifth Third Bank account number ******2551. The account is in the name of 60 Days Funding and Investment Group. AUGUSTIN is the authorized representative of 60 Days Funding and Investment Group.

BRIDGET M. BRENNAN
Acting United States Attorney

By: _____
CHELSEA S. RICE, CHIEF
White Collar Crime Unit

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section

By: _____
PHILIP TROUT
Trial Attorney, Fraud Section

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Northern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 1:21 CR 805 |
| | ) | |
| James Richard Stote | ) | |
| _Defendant_ | ) | **JUDGE BARKER** |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
_Defendant's signature_

_____
_Signature of defendant's attorney_

David Magilligan, Esq.
_Printed name of defendant's attorney_

_____
_Judge's signature_

_____
_Judge's printed name and title_

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | Case No. 1:21 CR 805 |
| v. | ) | |
| | ) | |
| Phillip J. Augustin | ) | JUDGE BARKER |
| _Defendant_ | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
_Defendant's signature_

_____
_Signature of defendant's attorney_

Michael C. Grieco, Esq.
_____
_Printed name of defendant's attorney_

_____
_Judge's signature_

_____
_Judge's printed name and title_